IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

MICHELLE SPEAR,                                    4:16-cv-511-RGE-HCA

        Plaintiff,

vs.

NANCY A. BERRYHILL, Acting                    REPORT AND RECOMMENDATION
Commissioner of Social Security,[1]                 (FILED UNDER SEAL)

        Defendant.

     Plaintiff Michelle Spear seeks review of the Social Security Commissioner's decision

denying her application for disability benefits (DIB) under Title II of the Social Security Act (the

Act), 42 U.S.C. §§ 401–434. This Court reviews the Commissioner's final decision pursuant to 42

U.S.C. § 405(g). The case is before the undersigned for report and recommendation pursuant to 28

U.S.C. § 636(b)(1)(B). The Court considers the matter fully submitted on the briefs.

## I.     PROCEDURAL AND FACTUAL BACKGROUND

     In 2013,[2] Ms. Spear filed an application for disability benefits alleging an onset date of

August 16, 2013. (Tr. at 175). The Social Security Administration initially denied Ms. Spear's

---

[1] Nancy A. Berryhill, became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Federal Rule of Civil Procedure 25(d), she is substituted for Carolyn Colvin as Defendant in this suit, which may continue without further action. *See* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

[2] The ALJ's findings and other records indicate Ms. Spear filed for disability on August 23, 2013 (*see* Tr. at 20, 86, 100). There is no application in the record dated August 23, 2013. The only application for DIB benefits that appears in the record is dated September 12, 2013. (Tr. at 175–81). Whether Ms. Spear filed her application on September 12, 2013 rather than August 23, 2013 is not material to this Report and Recommendation.

claim on December 31, 2013, (*id.* at 85–98) and again upon reconsideration on March 6, 2014. (*Id.* at 99–113). Ms. Spear requested a hearing (*id.* at 123–24), which was granted (*id.* at 125–133). Administrative Law Judge ("ALJ") Eric S. Basse held a video hearing on May 22, 2015. (*Id.* at 41–84). Ms. Spear appeared with attorney Shannon Schuehle; vocational expert Carma Mitchell also attended and testified. On September 25, 2015, the ALJ issued an unfavorable decision, finding Ms. Spear was not disabled. (*Id.* at 17–40). Ms. Spear requested a review of the ALJ's decision. (*Id.* at 15–16). The Appeals Council denied the request for review and the ALJ's decision became a final decision on August 26, 2016. (*Id.* at 1–6). Ms. Spear timely filed the Complaint [1] in this case on September 20, 2016.

### A. Educational and Vocational Factors

Ms. Spear was 42 years old when she filed for benefits. (Tr. at 175). She had past work as a 911 dispatcher for the Warren County Sheriff's department, an emergency dispatcher for Mercy Helicopter and Ambulance, and as a public transportation dispatcher. (*Id.* at 196). Ms. Spear also had worked as a medical assistant. (*Id.* at 75-78). Her highest level of education was an associate of applied sciences degree which she completed in approximately 2014. (*Id.* at 45).

### B. Medical Evidence

Ms. Spear's medical issues began after she was involved in a motor vehicle rollover accident on November 13, 2011. Ms. Spear was the driver and was not restrained. She was partially ejected, but able to extricate herself from the vehicle. (Tr. at 688). Ms. Spear sustained a C7 fracture; rib fractures; L2 and L5 fractures; left upper extremity, left hip and pelvic floor injuries; and a scalp laceration with scalp hematoma, but no other obvious head injuries. (*Id.* at 711). A CT and MRI of her head were negative. Ms. Spear underwent cervical discectomy, decompression and fixation and fusion procedures, using a cervical plate and screws and bone graft. (*Id.* at 713).

2

She was discharged to an acute rehabilitation facility and, after a course of therapy, discharged to her home on November 25, 2011, in stable condition. (*Id.* at 661–64).

On December 6, 2011, Ms. Spear was seen at Mercy Trauma Services Clinic with complaints of left hip/left lateral thigh muscle pain as well as some headache and transient dizziness. (Tr. at 658). An x-ray of her pelvis and left hip showed no acute osseous abnormality. (*Id.* at 659).

On January 26, 2012, Ms. Spear had a follow-up visit at Iowa Orthopedics. She noted she continued to have left upper and lower extremity pain and pelvic floor pain. (Tr. at 470). She saw Dr. Pothoven in Urology for her pelvic pain, who referred her for pelvic floor therapy along with the other physical therapy she was performing post-operatively. She complained of burning and tenderness in her neck, left hip, and pelvis. (*Id.*) At that time Ms. Spear weighed 304 pounds. (*Id.* at 471). On physical examination the physician's assistant noted weak hip muscles and mildly reduced range of motion. (*Id.*) Her gait was antalgic on the left side and she demonstrated tenderness in the groin. Ms. Spear's bilateral lower extremity strength was normal, as was her lower extremity neurovascular. (*Id.* at 472). The plan was to continue physical therapy for her neck and left hip and pelvic pain, pool exercises were encouraged, and Ms. Spear was to follow up in three to four weeks. (*Id.*)

Ms. Spear started physical therapy for her continued pelvic pain at Mercy West Physical Therapy on March 29, 2012. (Tr. at 449). The treatment plan included twice-a-week visits for eight weeks, to include "range of motion exercises, manual therapy, therapeutic exercise, a personalized home exercise program, patient education, body mechanics, posture, strengthening, self-care and home management, behavioral modification, biofeedback, neuromuscular re-education and dynamic activities." (*Id.* at 451). She continued with physical therapy for her hip throughout the

3

spring and summer of 2012 (with some absences (*id.* at 473–84)), experiencing cycles of pain and relief. (*Id.* at 372–442). She also walked in the swimming pool. (*Id.*)

On July 10, 2012, Ms. Spear was seen at Mercy West Physical Therapy for lymphedema treatment of her head and cognitive assessment. (Tr. at 341). Ms. Spear had experienced head edema since the accident, most noticeable in the morning, as well as numbness at the left temple. (*Id.*) She complained of headaches on the left side. Cognitively, Ms. Spear had memory recall problems, word finding issues, and could not remember passwords. (*Id.*) On examination the occupational therapist noted Ms. Spear had increased girth of her head and neck due to fluid retention, pitting edema/fibrotic tissue at the right mastoid process and occiput, dysesthesia in the left parietal area of the skill, and accepted Ms. Spear's report of memory recall and word finding issues. (*Id.* at 342). The treatment plan was for lymph node massage, myofascial release, Kinesio taping, guided therapeutic exercise, training in a home program and further cognitive retraining and assessments twice a week for 10 to 12 weeks. (*Id.*) Ms. Spear followed through with the therapy prescribed through July and August 2012. (*Id.* at 345–53).

On August 1, 2012, Ms. Spears was seen at Iowa Orthopaedic Center for a re-check of her persistent hip pain, which had been diagnosed as left hip trochanteric bursitis. (Tr. at 316). She received a cortisone injection in her hip in May 2012, and apparently another one before August. (*Id.* at 318). Physician's assistant Dudley Phipps discussed use of a foam roller in conjunction with continuing physical therapy, but was hesitant to administer another injection as she already had received two injections since May. (*Id.*)

Also on August 1, 2012, Ms. Spears began to see Dr. Donald Gilbert, a psychologist, as she was having trouble driving, getting out of the house, flashbacks to the accident, and daily panic and anxiety attacks. (Tr. at 321). In a September 17, 2012, Psychiatric Assessment Form, Dr.

4

Gilbert noted he had only met with Ms. Spears two times so far and could not yet determine what services might benefit Ms. Spear. (*Id.* at 322, 326).

Ms. Spear saw nurse practitioner Michelle Hunerdosse at Mercy Indianola Family Medicine & Urgent Care on August 14, 2012, following up from her injuries in the car accident. (Tr. at 527). Ms. Spear reported she was still in pain, particularly her left hip. Ms. Hunerdosse took a history from Ms. Spear, including all the treatment she was undergoing. Ms. Spear weighed 301 pounds on this occasion. On physical examination, Ms. Hunerdosse observed an edematous area on the left scalp. (*Id.* at 528). Ms. Spear was to follow up in eight weeks. (*Id.*)

On August 15, 2012, Ms. Spear called Mercy Neurosurgery complaining of neck pain and continued numbness and tingling affecting the index and middle fingers of her right hand. (Tr. at 518). A certified nursing assistant and physician's assistant saw her on August 23, 2012, at which time x-rays of the cervical spine were taken. (*Id.* at 511–12, 519). The x-ray showed the anterior fixation plate and interbody fusion material remained intact and in place with no significant change in the position and alignment of the bony elements. No new bony lytic or destructive changes were seen and the prevertebral soft tissues were unremarkable. (*Id.* at 519). On physical exam, Ms. Spear did not have any difficulty ambulating back to the exam room. No limp was detected. Her surgical incision was well healed. She weighed 295 pounds. The examiner noted 5/5 strength in bilateral upper extremities. (*Id.* at 511). Ms. Spear did have decreased sensation to light touch and pinprick over the webspace between her right index and middle fingers, and decreased sensation over the ulnar border of her thumb. (*Id.*) There was no evidence of thenar or hyperthenar wasting. She did have hyperesthesia with light touch over her upper thoracic spine. Her strength in her lower extremities was 5/5 and symmetric. Sensation was intact to light tough bilaterally in her lower extremities, her reflexes at biceps and triceps were 2+ and symmetric bilaterally, as were reflexes

at patella and Achilles. (*Id.*) The physician's assistant suspected Ms. Spear's neck pain to be myofascial in nature as her x-rays showed positive signs of fusion. (*Id.* at 512). Ms. Spear was directed to continue to work with physical therapy for both her chronic trochanteric bursitis and now upper thoracic back pain. She had no activity restrictions surrounding her cervical fusion and was to return to clinic as needed. (*Id.*)

By September 12, 2012, the physical therapist returned Ms. Spear to her physician as "patient is unable to progress due to perception of pain." (Tr. at 370). Ms. Spear was scheduled for consultation with a pain specialist to discuss other options of care. (*Id.*)

On September 20, 2012, Ms. Spear saw Dr. Clinton Harris at Mercy Center for Pain Medicine. (Tr. at 504). She described the pain to Dr. Harris as extending over the left outside of her left thigh with pain into the left buttock and into the inside of the left leg, up into the groin region. An MRI of her hip demonstrated evidence of bursitis. Ms. Spear reported having been treated with trochanter bursa injections twice, the first giving better results than the second. (*Id.*) The pain occasionally kept her up at night and was present throughout the day, worse with sitting. (*Id.*) Ms. Spear weighed 300 pounds at this visit. On physical examination, Dr. Harris noted negative straight leg raise bilaterally, normal gait and station and posture, and mild tenderness in the lumbosacral spine and pelvic regions with pain over the left greater trochanter and left ischial tuberosity with palpation. (*Id.* at 505). Dr. Harris administered an injection of Depo-Medrol in the left ischial tuberosity bursa. (*Id.* at 506). He directed Ms. Spear to continue with therapy. (*Id.*)

Ms. Spear returned to physical therapy on September 26, 2012, reporting her left hip was significantly better. (Tr. at 366). Treatment modalities were undertaken, the therapist noting tenderness at the greater trochanter but significantly reduced, improved levator ani mobility, tenderness at obturator internus and along the med ischial tuberosity and pubic rami, and

significantly decreased tenderness and tightness in piriformis and gemellus along the sacral border. (*Id.*) The same day Ms. Spear also had manual lymphedema drainage techniques during occupational therapy for her head pain. (*Id.* at 364). She had met her short term goals with a decrease in fullness of the left parietal lobe of her head and reduced dysesthesia on the left aspect of her head. Ms. Spear was to continue to work on long term goals of participating in home program without active outpatient therapy and working on getting to sleep and improving her word finding ability. (*Id.* at 363).

By October 10, 2012, Ms. Spear reported more pain to the physical therapist as she had been driving more because her husband had shoulder surgery. (Tr. at 361). Ms. Spear felt better mentally, although sleep was variable, and she was walking more. (*Id.*)

Ms. Spear returned to Mercy Center for Pain Medicine on October 18, 2012, for follow-up on her hip pain. (Tr. at 499). She reported she was at least 40% better and the pain over the side of her left hip was improved. She continued to have pain into her left buttock, although the intensity had improved, and some pain into her head. (*Id.*) Her physical examination findings remained the same and Dr. Harris noted he would hold off repeating injections at that time. (*Id.* at 500).

On November 12, 2012, Ms. Spear was discharged from physical therapy care for her complaints of left arm pain as she had seen good resolution of the pain with treatment. (Tr. at 360).

Ms. Spear underwent a neuropsychological evaluation at On With Life on December 7, 2012, at the recommendation of Dr. Gilbert. (Tr. at 329). Dr. Gilbert referred Ms. Spear to On With Life because she was experiencing some cognitive difficulties following the accident. (*Id.*). Dr. David Demarest, a clinical neuropsychologist, reviewed Ms. Spear's medical records from her hospitalization after the accident and conducted an extensive interview with Ms. Spear. (*Id.* at 329–30). She described her pain problems with her hip and pelvis and headaches, which were

getting worse. (*Id.* at 330–31). Ms. Spear had recently returned to work full-time dispatching for a public transportation company. (*Id.* at 330). She reported she had been in occupational therapy for lymph massage and myofascial release procedures and in physical therapy for her hip and pelvis pain. (*Id.*) She was taking three pain medications at the time of this visit. With respect to the cognitive difficulties, she reported that her husband said her personality had changed and she had some short-term memory difficulty, such as forgetting to flush the toilet or to shut the top of the washer. A friend had noted that Ms. Spear had become more assertive and would say things she would not have before the accident. (*Id.* at 331). She had been referred to a mental health professional because she was ruminating on her pain problems (among other personal issues). (*Id.*) Dr. Demarest conducted some tests over a four-hour period, noting Ms. Spear worked to the best of her abilities on all tests. (*Id.* at 332). Her test performances fell in the average range. What manifested during the testing were some mild attentional issues, which Dr. Demarest found consistent with her pain problems. (*Id.* at 335). He recommended she continue to work with Dr. Gilbert. (*Id.*)

On January 4, 2013, Ms. Spear was discharged from occupational therapy treatment for the lymphedema symptoms in her head and neck as she did not return for follow-up with the therapist after her visit on September 26, 2012, and canceled an October 23, 2012, appointment. (*Id.* at 357).

Ms. Spear saw Ms. Hunerdosse at Mercy Indianola Family Medicine on April 25, 2013. (Tr. at 524). She complained her right arm had been retracting and she was having aching pain. Specifically, Ms. Spear reported experiencing increasing episodes of involuntary movements of her right upper extremity. Her right wrist would flex and shoulder extend. Ms. Spear said her triceps was becoming sore. Her right index finger and middle finger had been numb since the accident. She had taken Nortriptyline and Cymbalta in the past, but did not feel these medications

helped. (*Id.*) She did not have neck pain any longer and no longer did physical therapy. (*Id.*) Ms. Hunerdosse conducted a physical examination, finding no paraspinal tenderness in the cervical spine. She was unable to elicit triceps reflexes. (*Id.*) She assessed nerve irritation in connection with the ACDF site and recommended Ms. Spear follow up with her neurosurgeon and restart Nortriptyline. (*Id.*). Cervical spine x-ray taken the same date showed the cervical segments were anatomically aligned with no fracture or dislocation and no evidence of instrumentation. (*Id.* at 529). There was interval incorporation of the bone graft as compared to an x-ray taken August 23, 2012. (*Id.*)

Ms. Spear followed up with Mercy Neurosurgery on May 6, 2013. She reported her right hand was "cramping up," making it difficult to type or write when this occurred. (Tr. at 515). The physician's assistant who saw Ms. Spear noted they could consider EMG/NCS for further evaluation. (*Id.*)

On August 30, 2013, Ms. Spear returned to Mercy Indianola Family Medicine for refills on prescriptions. (Tr. at 521). She reported to Ms. Hunerdosse that she tried to return to work at Red Rock, but had a return of pain and was unable to keep the job. (*Id.*) She complained of right arm pain "contracture" and her left posterior leg/groin pain was much worse. (*Id.*) She was using more Hydrocodone and using Butalbital for her increased headaches, but still was feeling poorly. (*Id.*) Her scalp was painful and numb so she was doing lymphatic massage. Ms. Spear reported anxiety, which affected her ability to ride in a car or drive. (*Id.*) She also was still taking Nortriptyline. (*Id.*) Ms. Spear weighed 309 pounds at this visit. On physical examination, all was normal. Her gait and station were within normal limits and her spine had normal alignment and range of motion. (*Id.* at 522). Her cranial nerves II to XII were intact. (*Id.*) Ms. Hunerdosse planned

to refer Ms. Spear to Physical Medicine and Rehabilitation for consultation. Ms. Spear was going to return to the swimming pool as that made her pain manageable. (*Id.*)

Ms. Hunerdosse saw Ms. Spear again on November 7, 2013. (Tr. at 532). Ms. Spear said she was in the process of filing for Social Security disability and needed to have an exam within thirty days of the determination. She reported she was feeling better since leaving her job and was using less pain medication, although her pain was not better. (*Id.*) According to Ms. Spear's husband, her pain was not well controlled at home, she was irritable, and likely was not taking pain medications as needed. (*Id.*) Ms. Spear was experiencing intermittent "contracture" symptoms in her right hand and arm, like a spasm or cramp, had headaches three to four times a week, and was awake a lot at night and up and down. (*Id.*) She weighed 309 pounds at this visit. (*Id.* at 533). After discussing Ms. Spear's pain issues, Ms. Hunerdosse suggested trying Cymbalta, refilled the prescription of Butalbital for headaches, and Ms. Spear was to continue with other medications, and recheck with the clinic in six weeks. (*Id.* at 534).

The Disability Determination Services Bureau referred Ms. Spear to Raymond Tibe, Psy.D, for mental status interview. Ms. Spear was tested on December 5, 2013, and Dr. Tibe's report prepared on December 9, 2013. (Tr. at 537). At the conclusion of his interview, Dr. Tibe concluded that Ms. Spear had an Axis I diagnosis of adjustment disorder with mixed mood, and a GAF of 55 to 60. (*Id.* at 539). Dr. Tibe could see that with respect to work activities, her "physical discomfort, difficulties with anxiety and catastrophizing could make attention, concentration and pace difficult at times." (*Id.*) Her judgment, ability to relate to people, and ability to process incoming information were all intact. (*Id.*)

Dr. David Smith, M.D, made an initial disability determination based on record review on December 31, 2013. (Tr. at 85–97). The examiner noted a consultative examination was required

because the evidence at that time was insufficient to support a decision on the claim. (*Id.* at 89). The examiner found Ms. Spear's statements about her functional limitations related to her mental medically determinable impairments were mostly credible, but partially eroded by the fact she did not have ongoing psychological/psychiatric treatment. (*Id.* at 92). As for the credibility of her allegations concerning her physical impairments, the examiner suggested that because all her treatment was provided by midlevel providers, physicians' assistants and practicing nurses, Ms. Spear's symptoms were not treatable or severe. (*Id.*) The examiner rated her exertional limitations as occasionally lifting/carrying 20 pounds; frequently lifting/carrying ten pounds; standing or walking about six hours in an eight-hour workday; sitting about six hours in an eight-hour workday; unlimited pushing/pulling; occasional ability to climb ramps/stairs; never climbing ladders/ropes/scaffolds; and occasionally balancing, stooping, kneeling, crouching and crawling. (*Id.* at 92–93). In reaching this RFC, the examiner explained the medical evidence of record did not identify ongoing limitations attributable to the medically determinable impairments which were non-severe. (*Id.* at 93). Ms. Spear was morbidly obese and had chronic myofascial pain syndrome. She admitted to improvement when participating in aquatic exercise programs. (*Id.*) The examiner was critical of her care as being provided by "unacceptable medical providers" and lacking in depth evaluations of her complaints in the files. (*Id.*) Russell Lark, Ph.D, assessed Ms. Spear's mental residual functional capacity, noting there was no evidence of ongoing mental health treatment in spite of Ms. Spear's reports to providers that she was struggling with depression. (*Id.* at 95). He concluded that "[h]er attention, concentration, and pace may vary with her . . . pain/pain medications," but she "is able to complete at least 3-4 step tasks on a sustained basis. (*Id.*)

Ms. Spear returned to Mercy Indianola Family Medicine on January 24, 2014. (Tr. at 541). Her chief complaint was pain in her hips and pelvis, headaches, right upper arm cramping, nerve pain down to her second and third fingers, and intermittent right-side rib aches. She wanted a referral to Physical Medicine and Rehabilitation. (*Id.*) Ms. Spear weighed 308 pounds at this visit. On physical examination, Ms. Spear's gait and station were within normal limits. (*Id.* at 542). A referral was made to the rehabilitation physician. (*Id.* at 543).

X-rays were taken on February 28, 2014, and March 10, 2014 (Tr. at 591–92). The first was a single view of the pelvis that showed chronic-appearing heterotopic ossification or periosteal reaction adjacent to the proximal femoral diaphysis, similar to a previous x-ray taken May 1, 2012. (*Id.* at 592). The radiologist recommended a dedicated view of the entire left femur. He saw no acute fracture involving the hips, but did see very mild degenerative spurring. (*Id.*) The left femur x-ray showed good position and alignment of the bony elements with no evidence of fracture or dislocation. Density was seen abutting the lateral and posterior aspect of the midshaft of the femur, most in keeping the heterotopic ossification and likely related to old trauma. (*Id.* at 591).

On February 28, 2014, Ms. Spear saw Dr. Ai Huong Phu at Mercy Physical Medicine and Rehabilitation to be evaluated for her hip pain. (Tr. at 783). She also had right sided arm pain and described the pulling sensation she would get in her arm with numbness in the index and middle finger. She described her left hip/groin/buttock pain as constant and worse with prolonged sitting. (*Id.* at 784). She did not have problems walking. Ms. Spear described the treatments she had tried. Dr. Phu took a complete history and conducted a physical examination. As relevant to her complaints, Dr. Phu observed Ms. Spear's gait and stance were normal, she was able to walk on toes and heels with good balance. (*Id.* at 785). Dr. Phu observed decreased cervical flexion, limited forward flexion of bilateral shoulders, no tenderness over the right arm nor spasticity. (*Id.*) Ms.

Spear's lumbar was normal with full flexion, extension, sidebending, rotation and no pain. (*Id.*) She had a negative straight leg raise on the left, positive Faber on the left, tenderness over the left greater trochanter and over the left SI and buttock and ischial tuberosity and pubic ramus. (*Id.*) Dr. Phu reviewed prior x-rays. Dr. Phu concluded Ms. Spear had neuropathic pain from her head laceration, left-sided greater trochanter bursitis, possibly a left SI joint irritation, and left gluteal myofascial pain. Dr. Phu recommended x-rays of the left SI joint and that Ms. Spear start a transdermal cream for her neuropathic pain on her head and left hip region. Dr. Phu thought Ms. Spear might need another greater trochanter injection and perhaps an ultrasound for possible fluid drainage. She recommended Baclofen for Ms. Spear's right upper extremity spasms and would see her in four weeks. (*Id.* at 787).

Jan Hunter, D.O., undertook a second record review on March 5, 2014. (Tr. at 100–13). Dr. Hunter reviewed the same medical records and other sources (statements by Ms. Spear, her husband, and a friend). Again, the examiner determined Ms. Spear's credibility was eroded because the medical evidence was treatment provided by "midlevel providers, physician assistants and practicing nurses suggesting her symptoms are not treatable or not severe." (*Id.* at 108). The mental health examiner, Scott Shafer, Ph.D, reached the same conclusions as before. (*Id.* at 110–11).

Ms. Spear followed up with Dr. Phu on March 28, 2014. (Tr. at 788). She reported the Baclofen seemed to help, but she could only tolerate the evening dose, which assisted her in sleeping two to three hours at a time. She reported still having the left internal pelvic pain, which worsened when she sat. At this visit she rated the pain at 4/10 and said it was constant. Lying down improved the pain. The films were not present for review, but the report indicated there was heterotopic ossification on the lateral aspect of the proximal femur. Ms. Spear also reported she

continued to have intermittent spasms in her right arm. (*Id.*) Dr. Phu conducted another physical exam with findings similar to the previous month. (*Id.* at 790). Dr. Phu continued the Baclofen prescription and would look for a provider who could do a pudendal block from which she thought Ms. Spear would benefit. Dr. Phu recommended Ms. Spear start pool therapy independently at least once a week. (*Id.* at 791).

On April 11, 2014, Ms. Spear saw Dr. Harris, the pain specialist, to assess her left pelvic pain. (Tr. at 588). Ms. Spear weighed 300 pounds at this visit. She described her pain as continuous and worsening as the day progressed. (*Id.* at 588). She needed to constantly change positions from lying down to standing up and sitting on the toilet to relieve the pain. On physical examination, Ms. Spear was alert and in no acute distress; as relevant here, her motor strength was normal in the upper and lower extremities; and there was tenderness over the ischial tuberosity on the left. (*Id.* at 589). Dr. Harris diagnosed pudendal neuralgia and thought it would be reasonable to try a left pudendal nerve block. (*Id.*) He started Ms. Spear on Lyrica and Venlafaxine and suggested she talk to a psychologist regarding biofeedback. (*Id.*)

Dr. Phu saw Ms. Spear on April 22, 2014, for a follow-up visit. Ms. Spear reported discussing the pudendal nerve block with Dr. Harris and felt she was interested, but wanted another opinion. (Tr. at 794). Her pain level on this occasion was 3/10, sharp and aching in nature, and constant. (*Id.*) Dr. Harris had given her a prescription for Cymbalta, but she had not started it yet. (*Id.*) She reported her pain worsened throughout the day, and when she changed positions from sitting to standing. (*Id.*) It mildly improved when she sat on the toilet and with lying down. (*Id.*) She had been taking the Baclofen in the morning and at night to help with the right arm, but the spasms were still occurring one to two times a day. Ms. Spear thought the Baclofen mildly helped. (*Id.*) Dr. Phu's physical examination observations were the same as in previous visits. (*Id.* at 796).

14

Dr. Phu advised Ms. Spear to follow up with a provider in Omaha for pelvic pain and treatment options, as well as contacting the University of Iowa for a provider who may perform pudendal blocks. (*Id.* at 797). Dr. Phu advised Ms. Spear that she could start Cymbalta and should continue Baclofen, with some adjustments in how she took the medication. (*Id.*) Knowing she had a disability hearing coming up, Dr. Phu gave a medical opinion that Ms. Spear could not tolerate a full work schedule that would require her to sit for more than 4 hours or stand for more than 4 hours, or need to be in a transitional position. She noted Ms. Spear wanted to return to some employment, but her pelvic discomfort was distracting and she could not function in a competitive environment with her current pain. (*Id.*)

Ms. Spear was seen at Mercy West Physical Therapy on April 23, 2014, seeking assistance with the pelvic pain. (Tr. at 603). She reported seeing Dr. Harris for a saddle block to pudendal nerve, but he did not perform that procedure. She was scheduled for biofeedback on May 22, 2014. Walking varied depending on how flared up her condition was, but driving or riding in a car worsened the condition. (*Id.*) Ms. Spear reported some urinary leakage with coughing or sneezing and some trouble emptying her bladder. Her main complaint was left lower pelvic pain that made her feel like she was sitting on a log and caused numbness. (*Id.*) There was impairment to her sexual functioning and constipation. She also reported some problems with anxiety and sleep. (*Id.*) The therapist noted Ms. Spear walked with a mild antalgic gait and decreased weight bearing through lower left extremity during midstance. She could walk on her toes and heels and her pelvis was symmetric in stance. (*Id.*) Ms. Spear had significant palpable tenderness pain along the left pubic rami, flex pain at the left ischial tuberosity and extension pain in the left back lower extremity. The treatment plan was for Ms. Spear to be seen one to two times a week for six to eight weeks with treatment to include range of motion exercises, manual therapy, therapeutic exercise,

a personalized home exercise program, patient education, body mechanics, posture, aquatic exercise, strengthening self-care and home management, behavioral modification, biofeedback, neuromuscular re-education and dynamic activities. (*Id.* at 604).

When she reported to Mercy West Physical Therapy on April 30, 2014, Ms. Spear had driven considerably the previous day, but her pain was about the same. (Tr. at 599). Objectively, the therapist observed swelling along the left perineum along the glut fold, external tenderness at the area of the obturator internus and along the pubic rami and internal levator ani. The therapist was unable to get to good position for external treatment due to the swollen area and tightness in both muscles. (*Id.*)

Ms. Spear's next visit with Dr. Harris was June 19, 2014. (Tr. at 584). Ms. Spear continued to have pain in pelvic region into the buttock area as before. She thought the Cymbalta was helping somewhat. (*Id.* at 585). She could not obtain the prescription for Lyrica based on its cost and her insurance coverage. (*Id.*) She tried a TENS unit, which did not help. (*Id.*) Ms. Spear reported taking Hydrocodone pills up to two pills a week for flares and took Baclofen, half a pill during the day and one pill at night. (*Id.*) On physical examination Dr. Harris noted tenderness over the ischial tuberosity on the left. (*Id.*) His plan was to increase Cymbalta and stop Nortriptyline, start Gabapentin at night, and increase that dosage after a week. (*Id.* at 584). Materials on Medtronic spinal cord stimulation were given to Ms. Spear. (*Id.*)

The physical therapist at Mercy West Physical Therapy made a note to Ms. Spear's file on July 3, 2014, concerning information on saddle blocks and pudendal nerve blocks. Ms. Spear was to be discharged from care to reinitiate with physician follow up and consultations for pudendal nerve injection. (Tr. at 609).

Ms. Spear returned to see Dr. Harris on July 31, 2014. (Tr. at 580). She reported the Cymbalta was "really messing with me" causing her to "ruminate all night long with weird thoughts." (*Id.*) Her pain continued into the left groin and hip and was constant sharp shooting cramping. (*Id.* at 581). Her physical examination was the same as the prior month. (*Id.*) Dr. Harris's plan was to reduce Cymbalta dosage for two weeks then stop, increase Gabapentin, and consider switching to Gralise. (*Id.* at 580). Dr. Harris noted Ms. Spear had an appointment at the University of Iowa on September 2, 2014. (*Id.* at 580).

Ms. Spear also saw Dr. Phu on July 31, 2014. (Tr. at 800). She reported her pelvic pain was the same and got progressively worse during the day. Her pain level at this visit was 4/10. She reported Dr. Harris had increased her Gabapentin and decreased Cymbalta prescriptions. Ms. Spear said her pain was worse riding in cars and sitting in certain chairs, but improved when she sat on the toilet or lay down. Her right upper extremity spasms continued and she continued to take Baclofen. She reported she had an appointment at University of Iowa on September 2 for possible pudendal block. (*Id.*) Ms. Spear was attempting  to get out of the house three days a week, was walking, but had not been using the pool at the Y. (*Id.*) The results of Dr. Phu's physical examination were similar to the previous examinations. Dr. Phu provided a refill of the Baclofen prescription and encouraged Ms. Spear to resume pool exercises, suggesting she try treading water in the deeper end instead of walking in the pool. (*Id.* at 803). She was to follow up with Dr. Harris regarding Cymbalta and Gabapentin and would follow up with the physician in Iowa City for pudendal block evaluation. They discussed the possibility of Botox in the right upper extremity. Ms. Spear was to follow up with Dr. Phu in six months. (*Id.*)

On August 14, 2014, Ms. Spear reported to Mercy Indianola Family Medicine to recheck and review medications, as well as other unrelated medical issues. (Tr. at 616). Ms. Hunerdosse

renewed the prescription for Hydrocodone and added Diazepam for spasming and to help with sleep. (*Id.* at 617). Ms. Spear was to follow up with her pelvic pain issues in Iowa City. (*Id.* at 618).

On September 2, 2014, Ms. Spear saw Dr. Eugenia Mazur in the Obstetrics and Gynecology Department at the University of Iowa Hospitals and Clinics. (Tr. at 548). In addition to the history subsequently reported to Dr. Benedetti, Ms. Spear noted she had a decreased sensation of a full bladder and had episodes of urinary leakage. (*Id.*) She had a history of constipation, which worsened on medications such as Hydrocodone and Gabapentin. (*Id.* at 549). The results of her pelvic exam, on which she demonstrated reduced sensation on the left side and significant tenderness and hypertonicity of the pelvic floor muscles mostly on the left side, were significant for pudendal nerve entrapment. (*Id.* at 550–51). Dr. Mazur recommended increasing the dosage of Gabapentin gradually up to 1200 mg three times a day, started Diazepam tablets at bedtime vaginally, and referred Ms. Spear to the pain clinic for potential therapeutic and diagnostic block. (*Id.* at 551). Ms. Spear was provided the names of pelvic floor physical therapists in her area and recommended to start physical therapy with one of these individuals. (*Id.*)

Dr. Esther Benedetti next saw Ms. Spear in the Department of Anesthesiology at University of Iowa Hospitals. (Tr. at 545–53). Dr. Benedetti took a complete history and performed a physical examination. Ms. Spear described the pain as a constant ache "like sitting on a log" that progressed during the day, all on her left side. (*Id.* at 546). The pain affected her sexual life and ability to work. It improved with standing and with sitting on a toilet. Ms. Spear rated the pain at 8/10 in severity. (*Id.*) She told Dr. Benedetti she was being worked up for a spinal cord stimulator, but wanted to explore her options, including a pudendal nerve block, which other providers had suggested. (*Id.*) On physical examination, Ms. Spear was alert and cooperative and appeared in no

distress. (*Id.* at 547). Her extremities were atraumatic with no cyanosis or edema, pulses 2+ and symmetric. Her motor strength was 5/5 grossly intact in lower extremities; her reflexes 2+ and symmetric; her gait antalgic. (*Id.* at 548). After evaluating Ms. Spear, Dr. Benedetti offered her a ganglion impar block that day which Ms. Spear declined, deciding to wait until Dr. Elahi (who performed pudendal nerve blocks more frequently) was back in the clinic, or might consider moving ahead with saddle block. (*Id.*) Ms. Spear was to follow up within a week or at her earliest convenience. Dr. Benedetti's plan included a strong recommendation for pain psychology including cognitive behavioral therapy, coping, relaxation and biofeedback, and that Ms. Spear should continue physical therapy, consider aquatherapy and lose weight. (*Id.*) Dr. Benedetti recommended against a spinal cord stimulator until other less invasive, more aggressive conservative treatments had been "maximized" and that Ms. Spear be weaned off narcotic medication all together. (*Id.*)

On September 9, 2014 Ms. Spear was seen at Mary Greeley Rehab & Wellness for a physical therapy evaluation. (Tr. at 556). A history was taken concerning her condition and prior treatments. Ms. Spear's primary complaints were left lateral hip pain, left-sided vaginal/buttock pain with sitting, dyspareunia, urinary incontinence, constipation. (*Id.*) The therapist performed a vaginal examination, which revealed erythema extending from the labia majora to the vestibule, consistent with contact vulvitis. Some papillary changes were noted indicating chronic irritation. There was some mild acanthosis nigricans along the medial thighs. Ms. Spear tolerated a one finger exam with stretch of the pelvic floor muscles fairly well. There was more pain on the left with palpation and significant connective tissue restriction only in the adductor crease and medial to the ischial tuberosity. (*Id.*at 558). The therapist also noted the abdomen was obese with lower abdominal strength < 1/5. Hip rotation was normal and did not produce groin pain. Hip strength

was 5/5, except with hip extension (4/5) and abduction—on the left hip abduction was 3/5 and painful, 3+/5 on the right. Prone hip rotation strength was 5/5 and pain-free. There was exquisite pain with palpation over the left greater trochanter. (*Id.*) The therapist's plan was to teach vulvar skin care guidelines and use of skin protectant, manual stretch with progression to self-dilating, and connective tissue manipulation to areas of restriction. Ms. Spear was to continue timed voiding and avoid bladder irritants, try Miralax daily and participate in hip/core strengthening. (*Id.*) From the records, it appears Ms. Spear received treatments on September 11, 2014; October 2, 2014; and December 16, 2014. (*Id.* at 561–68).

In the meantime, Ms. Spear saw Dr. Harris on September 12, 2014. (Tr. at 576). She reported that she had refused the injection Dr. Benedetti recommended, was increasing her Gabapentin and started some physical therapy focused on scar tissue release that seemed to have flared her pain symptoms. (*Id.* at 576–77). Dr. Harris noted he would increase the prescription for Gabapentin and add Venlafaxine. If there was no improvement, he would recommend proceeding with left pudendal nerve block with ultrasound and giving consideration to spinal cord stimulation. (*Id.* at 576).

On January 20, 2015, Ms. Spear visited Mercy Indianola Family Medicine to refill her Hydrocodone prescription. (Tr. at 610). She reported her right arm pain had gone into her upper arm. Dr. Harris was relocating out of state. (*Id.*) Ms. Spear reported concerning her Iowa City visit and that she had tried Diazepam intravaginally, but was not sure it helped. Ms. Spear said the pain doctor in Iowa City "scoffed" at her issues, but Ms. Spear did get a referral to a new women's health physical therapist in Ames who Ms. Spear had seen. Ms. Spear also was referred to a Christian women's counselor at Glen Haven, Cora Schuhmacher. (*Id.*) Ms. Spear reported her right arm was still bothering her and spasmed. She was taking Baclofen, icing and using Ibuprofen. (*Id.*)

On this occasion Ms. Spear weighed 317 pounds. Her physical examination was normal. Ms. Hunerdosse's plan was to continue with present treatment plan. The prescription for Hydrocodone was refilled, but there would be no more refills. (*Id.* at 612).

On February 20, 2015, Ms. Spear went to Mercy Indianola Physical Therapy for treatment of right elbow pain and muscle weakness upon the referral of Ms. Hunerdosse. (Tr. at 645). Ms. Spear reported it started in December 2014 after she spent time playing games on her phone. (*Id.*) She could not completely straighten her elbow because of the pain. (*Id.*) Historically, she reported she occasionally got "contractures" in her right arm where her elbow bends, wrist bends, and fingers straighten. (*Id.*) Ms. Spear did not have shoulder or wrist pain. Not moving her elbow relieved symptoms. Massage and Ibuprofen had not brought relief and she often woke during the night due to pain. (*Id.*). On physical examination, there was pain with palpation to the lateral epicondyle, triceps insertion, distal bicep tendon, wrist extensor, musculature, radial head, ulnar nerve and median nerve. (*Id.* at 645–56). Range of motion of the right shoulder was within normal limits and pain free. Pain was reproduced with active right wrist extension. (*Id.* at 646). The treatment plan was for rehabilitative physical therapy one to two times per week for eight weeks. (*Id.* at 647). Treatment would include therapeutic exercise/activity for progressive strengthening, stretching/flexibility and range of motion, joint mobility/motion, and to decrease pain. Manual therapy would include manual stretching, range of motion, soft tissue mobility, myofascial/connective tissue release and joint mobilization. Modalities would include ice/heat, electrical stimulation, iontophoresis dexamethasone and ultrasound. (*Id.*) Records from Mercy Indianola Physical Therapy indicate Ms. Spear was treated five times between February 20, 2015, and March 6, 2015. (*Id.* at 635).

Ms. Spear saw Dr. Dana Simon at Pain Specialists of Iowa, who took over from Dr. Harris, on February 27, 2015. (Tr. at 815). Ms. Spear described her treatment history to Dr. Simon and indicated she was working on increasing her Gabapentin dosage, had started some physical therapy that seemed to have flared her pain symptoms, and was starting to use a CPAP at night. (*Id.* at 816). On physical examination, as relevant here, Dr. Simon detected no pain over the left groin or lower abdomen, but observed negative straight leg raising and apparent myofascial pain over the left ischium and tenderness over the ischial tuberosity on the left. (*Id.* at 816–17). He increased her Gabapentin to 600 mg three times a day. (*Id.* at 815). Dr. Simon told Ms. Spear he had not done a pudendal block in over 30 years and doubted its application at this time. (*Id.*) He discussed evaluation with further specialists, one in West Virginia and another at Carolinas Medical Center. (*Id.*)

Between March 6, 2015, and April 3, 2015, Ms. Spear sought acupuncture treatment at Soaring Crane Acupuncture. (Tr. at 770–72). She responded to the first treatment well, but with the next treatments only had temporary relief. (*Id.* at 772).

Ms. Spear returned to see Dr. Phu on April 9, 2015. (Tr. at 806). She reported her pain was the same with a pain level that day of 2/10. Ms. Spear reported going to Iowa City for evaluation for pudendal nerve block, but did not get it and did not feel comfortable there. (*Id.*) She did not have any new symptoms and came in for medication refill. (*Id.*) She reported that after Dr. Harris left, Dr. Simon saw her and told her he did not think a pudendal block would be helpful. Ms. Spear told Dr. Phu she did not want to give up on improving her pain. She was getting out of the house three days a week and going to the pool once a week to tread water and walk. Ms. Spear saw a physical therapist in Ames five times who focused on pelvic pain, but stopped as the travel was taking a toll. (*Id.*) Ms. Spear had been referred to a chronic pain therapist who she liked. (*Id.*) On

this occasion Ms. Spear weighed 327 pounds. Her physical examination results were consistent with prior examinations. (*Id.* at 808–09). Dr. Phu provided a refill prescription for Baclofen with a recommendation of increasing to three times a day if Ms. Spear could tolerate it. She recommended a consultation with Dr. Stalvey for pudendal nerve block to improve her pelvic pain. (*Id.* 810). They discussed the possibility of Botox in her right upper extremity. Ms. Spear was to return in three to four months. (*Id.*)

Dr. Phu provided a statement to the SSA on April 21 and 22, 2015. (Tr. at 819–20). She disagreed with the assessment Ms. Spear could lift or carry 20 pounds occasionally, indicating she thought Ms. Spear could lift or carry less than ten pounds frequently based on her right upper extremity spasms with increased weight. (*Id.* at 819). Dr. Phu also disagreed with the SSA assessment Ms. Spear could lift or carry ten pounds frequently, based on her right upper extremity spasms with increased weight. (*Id.*) She disagreed Ms. Spear could stand or walk six hours in an eight hour work day and indicated she could stand or walk at least two hours based on her left buttock/groin/pelvic pain. (*Id.*) Dr. Phu disagreed with the assessment that Ms. Spear could sit six hours in an eight hour work day, indicating she must alter positions about every ten minutes to stand and walk based on her left buttock/groin/pelvic pain. (*Id.*) She disagreed Ms. Spear could occasionally climb, stoop, kneel, crouch, or crawl and said she could never perform these activities as they would aggravate her right upper extremity and left buttock/groin/pelvic pain. (*Id.*) She also disagreed with the assessment Ms. Spear could continuously reach, handle, finger, or feel and gave the opinion that she might occasionally reach, handle, finger or feel with the left upper extremity only and seldom with the right. (*Id.*) She reported she had been treating Ms. Spear since February 28, 2014, for right upper extremity spasms, neuropathic pelvic pain, left greater trochanter bursitis, heterotopic ossification of the left femur, and head numbness. (*Id.* at 820). Dr. Phu said Ms. Spear

was compliant with prescribed treatment. She told SSA Ms. Spear could not tolerate a routine work schedule, but could do intermittent, unscheduled work no more than twice a day with change in positioning if she was not too distracted by pain. (*Id.*) She agreed Ms. Spear would need frequent unscheduled breaks because she could not tolerate one position for more than 10 to 15 minutes before pain or increased fatigue began. (*Id.*) She agreed that Ms. Spear's statement that her pelvic pain interfered with her activities of daily living and her ability to sit, walk, and stand for extended periods of time was consistent with her medical condition and noted sitting for prolonged periods would aggravate her pain. (*Id.*) Dr. Phu stated Ms. Spear could have "bad days" or be absent from work due to her medical condition once or twice a week, that her subjective complaints of pain were credible, and did not believe there was any inconsistency between her medical opinion and her treatment notes. (*Id.*)

On April 24, 2015, Ms. Hunerdosse was requested to respond to the SSA's assessment of Ms. Spear's work capabilities. (Tr. at 648–52). She attached a letter to the SSA form she had been sent. (*Id.* at 650–52). Ms. Hunerdosse did not agree Ms. Spear could lift or carry 20 pounds occasionally (up to 1/3 of the time) and said instead Ms. Spear could lift or carry less than ten pounds occasionally because she could not walk or stand for 1/3 of a work day based on the pain in her pelvic area/pudendal nerve region. She believed Ms. Spear should lift ten pounds or less infrequently. Ms. Hunerdosse disagreed that Ms. Spear could stand or walk for six hours in an eight hour work day because she required frequent breaks and position changes based on the same pain concerns. (*Id.*) She did not believe Ms. Spear could sit for six hours in an eight hour work day for the same reasons. Ms. Hunerdosse indicated Ms. Spear should not be required to climb, stoop, kneel, crouch, or crawl on a regular basis again based on her pain and inability to get back into a standing or sitting position without assistance. (*Id.*) She believed Ms. Spear could continuously

reach, handle, finger, and feel for the time period she was able to sit (in two-hour increments). Ms. Hunerdosse noted Ms. Spear had right arm pain and weakness and associated muscle spasms arising from her cervical spine fracture. (*Id.*) Following her motor vehicle accident, Mr. Hunerdosse stated the most painful of Ms. Spear's injuries was the pelvic floor pain for which Ms. Spear had been to physical therapy, gynecologists, pain specialists, and other health professionals to receive care. (*Id.* at 651). Ms. Hunerdosse noted Ms. Spear had been compliant with all recommended treatment and had sought out additional specialists and modalities on her own. (*Id.*) Ms. Hunerdosse gave the opinion that Ms. Spear could not perform a job requiring eight hours per day, five days per week as Ms. Spear regularly had "bad" days that required management with pain medications that caused drowsiness and frequent position changes and other treatment modalities. (*Id.*) She opined that Ms. Spear would need frequent unscheduled breaks of 10 to 15 minutes during the day to relieve pain and fatigue. (*Id.*) Ms. Spear had two types of headaches: migraines and another type related to the injury to the left scalp of her head, the latter of which occurred about three times per month for one to three hours at a time. (*Id.*) Ms. Spear estimated Ms. Spear had "bad days" three times a week or twelve days per month when she was confined to home, moving from bed to couch or toilet, taking medications which caused drowsiness. (*Id.* at 651–52). Ms. Hunerdosse found Ms. Spear's subjective complaints of pain to be credible, particularly as she had seen her regularly during her rehabilitation. (*Id.* at 652).

### C.      Hearing Testimony

At the time of hearing on May 22, 2015, Ms. Spear was 44 years old. She graduated from high school, attended some college, and in recent years after her accident obtained an associates of applied science degree specializing in graphic design. (Tr. at 44–46). She had been taking classes in photography before the accident, but could not bend, kneel, or stabilize a camera well

enough after the accident. (*Id.* at 46–47). The ALJ discussed Ms. Spear's right-sided contracture problems—Ms. Spear was right handed and demonstrated how her wrist or fingers would fold down and her elbow would pull back. (*Id.* at 48). Ms. Spear indicated that on occasion she also experienced spasms down her ribcage on the right side. (*Id.* at 49). To relieve the contracture she told the ALJ she sometimes would have to hang onto a door and reach up to stretch the muscles until they let go. (*Id.* at 49). Ms. Spear was taking Baclofen for the contractures, which occurred anywhere from twice a day to ten times a day during activities in which she might need to reach for items or use a computer mouse. (*Id.* at 50-51). She testified that Dr. Phu opined the contractures were linked to her spinal cord injury. (*Id.* at 52). Ms. Spear was able to complete her coursework in spite of the contracture problem because she was able to turn in assignments late or took a lesser grade. (*Id.* at 52–53).

Ms. Spear told the ALJ she could cook small meals and put laundry in the washer once her husband carried the laundry to the laundry room. Her husband did the sweeping and mopping. (Tr. at 53–54). Ms. Spear could do grocery shopping, but always took someone with her. She did not drive after her accident and whoever went to the store with her would grab items from the top or bottom shelves and get the heavy items. She would get contractures if she did such reaching and lifting. (*Id.* at 54–55).

The ALJ discussed the diagnosis of pudendal neuralgia with Ms. Spear. (Tr. at 56) Ms. Spear testified that Dr. Simon wanted her to see a doctor in West Virginia or Virginia who might be able to treat the condition. (*Id.* at 56–57). Dr. Phu was sending Ms. Spear to an anesthesiologist in Des Moines at the end of June to discuss another kind of nerve block. (*Id.* at 57). Sitting on donut cushions was not as helpful as sitting on a toilet as there was more free area open underneath

on the toilet. (*Id.*) Ms. Spear had to stand up a short time into the hearing. (*Id.* at 58). She was not working at the time of the hearing and had not worked the last couple of years. (*Id.*)

On examination by her attorney, Ms. Spear testified she went to work at Red Rock after the accident against her doctor's wishes, but only lasted seven to eight months there. Her pain increased, the contractures increased and she was having to take several breaks during the work day. (Tr. at 58–59). She missed several days of work because of pain, exhaustion, and anxiety. (*Id.* at 59). Ms. Spear testified she made several mistakes in scheduling public transportation, which increased her anxiety, and she attributed her mistakes to her pain. She told the ALJ it was hard to focus as the pain increased during the day. (*Id.* at 59–60). When she got home at the end of a work day she would go to bed for a while, then get up and take more pain medication. At work she would be irritable and have conversations "that were not typical of someone that you want working there." (*Id.* at 60). Ms. Spear did not think she could adjust to something more repetitive and simple as compared to dispatching because it was hard to know whether she would have a good day or bad day since the pain was progressive. (*Id.*)

Ms. Spear's classes were either one-hour or two-hour classes one or two days a week. (Tr. at 61). During class she would have to change positions and go lean on the doorjamb. (*Id.*) She would miss class when her husband was out of town or if she woke up in pain. (*Id.* at 61-62). Ms. Spear testified her pelvic pain was better in the morning but would worsen during the day. (*Id.* at 62). She tried a TENS unit but it did not alleviate her pain, just put it off a bit. (*Id.*) She tried acupuncture which worked at first, but then did not towards the end. (*Id.* at 62-63). Acupuncture treatments were not covered by insurance and Ms. Spear could not afford them. (*Id.* at 63).

Ms. Spear estimated she could walk ten minutes on even ground, but then her pelvic pain would start. (Tr. at 63). She would then sit and if that did not work, go lay down, or go sit on the

toilet. (*Id.*) She believed she had an abnormal gait as she favored her left pelvis inside, causing her to limp when she walked. (*Id.* at 63–64). She got tired standing and estimated she could stand fifteen minutes on a good day. Ms. Spear sat down at this time during the hearing because she was getting uncomfortable. (*Id.* at 64). She told the ALJ most of her pain was from sitting. She estimated she could sit 10 to 15 minutes at a time, maybe 25 minutes if it was a good day. (*Id.*) Her medication helped dull the pain, but did not alleviate the pain and made her groggy and sleepy. (*Id.* at 65). Ms. Spear would nap throughout the day, sometimes from half an hour to an hour and a half. (*Id.*) The contractures affected her daily activities because she could not do anything while having one. Sometimes the contractures would be repetitive and happen a few times in a row. (*Id.* at 65–66). Ms. Spear had headaches three to five times a month during which her head felt swollen. (*Id.* at 66). She used heat and lymphatic massage to try to relieve the headaches. A headache could last three to five hours during which she would lay in bed and use heat and massage. (*Id.* at 66). No specific activity triggered headaches, but weather might. (*Id.* at 67). If Ms. Spear pushed herself to do more activity in a day, she would be in more pain in the evening and take more pain medications, which caused constipation, which in turn caused her pudendal nerve to flare. (*Id.*) The whole next day she would be in bed or up and down or on the toilet. (*Id.* at 68). As an example of pushing herself too much, Ms. Spear told the ALJ she did two loads of laundry, scooting the laundry hamper down the hallway, and it caused her pain to the extent she spent the next day in bed and on the toilet most of the day. (*Id.*) Ms. Spear estimated she could lift ten pounds if it did not cause a contracture. (*Id.* at 69).

Ms. Spear testified she and her husband used to be fairly social and were involved in a card club. She also was a scrapbooker and would go to weekend events. (Tr. at 69). She did not do either any more except she sporadically would play cards, just not in a club. (*Id.*)

Ms. Spear was getting mental health treatment to help her deal with her chronic pain. (Tr. at 69–70). She was frustrated with not working. (*Id.* at 70). She had memory issues and it was difficult to focus on days when she was in a lot of pain. (*Id.*) Ms. Spear needed assistance with certain clothing items, such as if it fastened behind her back. (*Id.*) She changed her hair style because reaching behind her head was an issue. (*Id.*) She also had some incontinence issues so had to change clothes more frequently or wear things that were easier to get on and off. (*Id.* at 71). She testified her interactions with people had changed as she was not as friendly, loving, and outgoing. She also was going to counseling to learn how to interact with people when she was in pain. (*Id.*) She was going to the Y in Indianola once or twice a week to walk and do some water exercises. (*Id.* at 73).

Carma Mitchell, the vocational expert, testified next. In response to the ALJ's hypothetical of an individual claimant's age, education, and past work experience, capable of light work as defined in the DOT, but sitting limited to no more than two hours a day, standing throughout the work day; occasional climbing ramps and stairs; occasional balance, stoop, kneel, crouch, crawl; no ladders, ropes, or scaffolds; and cognitively capable of three and four-step tasks, the VE said there would be no past work, but there would be jobs such a unskilled mail clerk, information clerk, and photocopy machine operator. (*Id.* at 78–79). In a second hypothetical, modified to exclude overhead reaching, and frequent handling and fingering with the right dominant, upper extremity, the VE said the same jobs would remain available. (*Id.* at 79). In response to a third hypothetical, which included no overheard reaching and only occasional handling and fingering with the right dominant, upper extremity, the VE did not feel those jobs remained, but there would be jobs such as counter clerk, conveyor line tender, and usher. (*Id.* at 79–80). In response to a fourth hypothetical which included using the right dominant extremity only 10% of the work day,

the VE did not feel there would be any jobs remaining. (*Id.* at 80). Finally, in response to an individual who was capable of lifting no more than ten pounds occasionally/frequently less than ten; who could stand and walk two hours in a workday; could sit, but must alternate positions; could stand every ten minutes, then sit ten minutes, then stand and walk about, then sit; occasional reaching, handling, and fingering with the right upper extremity, the VE said there would be no work on a full-time competitive basis. (*Id.* at 81). In response to claimant's attorney's question adding to hypotheticals one, two and three that the individual would need to take frequent unscheduled breaks in addition to regularly scheduled breaks and lunch, up to 10 to 15 minutes to relieve pain, release a contracture, or lie down at least twice a day, the VE testified there would be no work on a full-time basis. Adding to the same hypotheticals, the individual would be absent two or more days per month, the VE opined those restrictions would not be tolerated and there would be no work. (*Id.*at 81–82). Finally, adding to the hypotheticals the individual would be required to work a slow pace up to one-third of the day, the VE said the person could not sustain full-time competitive employment. (*Id.* at 82)

## II.     FINDINGS OF THE COMMISSIONER

In order to qualify for benefits under the Act, Ms. Spear must have been disabled. "Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d). The Commissioner uses the following five-step evaluation to determine whether a claimant is disabled within the meaning of the Act and therefore eligible for disability benefits: "whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past

relevant work; and if not, (5) whether the claimant can perform any other kind of work." *Byes v. Astrue*, 687 F.3d 913, 915 n.2 (8th Cir. 2012) (quoting *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009)). If at step (4) the ALJ makes a finding that a claimant is unable to perform his/her past relevant work, the burden shifts to the Commissioner to prove with medical evidence the claimant "has a residual functional capacity to do other kinds of work, and that other work exists in significant numbers that [claimant] can perform." *Nalley v. Apfel*, 100 F. Supp. 2d 947, 952–53 (S.D. Iowa 2000)(citing cases).

Following the requisite five-step evaluation, the ALJ issued the written decision at issue in this case on September 25, 2015, and made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2.    The claimant has not engaged in substantial gainful activity since August 16, 2013, the alleged onset date (20 C.F.R. 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease, pudendal neuralgia of the left hip/pelvis, obesity, and adjustment disorder with depressed mood (status-post motor vehicle accident in 2011) (20 C.F.R. 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except sitting up to two hours in a workday; occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching, or crawling; never climb ladders/ropes/scaffolds; no overhead reaching; and with her right-dominant hand can only occasionally handle and finger. Mentally, she can perform three to four step tasks.

6.    The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565).

7.      The claimant was born on January 16, 1971 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563).

8.      The claimants has more than a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from August 16, 2013, through the date of this decision (20 C.F.R. 404.1520(g)).

(Tr. at 22–34).

## III.     STANDARD OF REVIEW

This Court "will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)(quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)); *see also Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013); *Young v. Astrue*, 702 F.3d 489, 491 (8th Cir. 2013); 42 U.S.C. §405(g)("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

> Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. To determine whether substantial evidence supports the decision, we must consider evidence that both supports and detracts from the decision. If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently.

*Wildman v. Astrue*, 596 F.3d 959, 963–64 (8th Cir. 2010)(internal citations and quotation marks omitted); *see Phillips v. Colvin*, 721 F.3d 632, 625 (8th Cir. 2013); *Kamann*, 721 F.3d at 950; *Young*, 702 F.3d at 491. The Court will not overturn the ALJ's decision as long as the decision "falls within the available zone of choice." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011); *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009)(quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "The ALJ's decision 'is not outside the zone of choice simply because [the Court] might have reached a different conclusion had [the Court] been the initial finder of fact.'" *Heino v. Astrue*, 578 F.3d at 879 (quoting *Bradley*, 528 F.3d at 1115); *see Buckner*, 646 F.3d at 556.

## IV.   DISCUSSION

### A.   Assessment of Treating Opinions

Plaintiff first argues the ALJ failed to accord sufficient weight to the opinions of Ms. Spear's treating physician Dr. Phu, nurse practitioner Michelle Hunerdosse, and physical therapist Joann Green. Defendant responds the ALJ properly evaluated their opinions.

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008) (quoting *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007)).

> A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. . . . A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)(citing *Ghant v. Bowen,* 930 F.2d 633, 639 (8th Cir. 1991) and *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)). Generally, the opinion of a consulting physician who has examined the claimant only once or only reviewed records is not

substantial evidence, nor is the testimony of a vocational expert based on that evidence. *Singh*, 222

F.3d at 452 (quoting *Kelley*, 133 F.3d at 589 and citing *Nevland v. Apfel*, 204 F.3d 853, 858 (8th

Cir. 2000)). Additionally,

> [u]nder SSR 06–3p, the opinions of nurse practitioners are not "acceptable medical sources." *See also* 20 C.F.R. § 404.1513(a)(explaining that an acceptable medical source is a licensed physician, psychologist, optometrist, podiatrist, or speech-language pathologist). This means that Nurses Horn and Hampton cannot establish the existence of a medically determinable impairment, serve as a medical expert, or be considered a treating source whose medical opinions may be entitled to controlling weight. SSR 06–3p. However, these opinions may serve as "other sources" to provide insight into the severity of an impairment and how it affects a claimant's ability to function. *Id.*

*Hendricks v. Colvin*, No. 16cv30-DDN, 2017 WL 193558, at *4 (E.D. Mo. Jan. 8, 2017).

### 1.   Dr. Phu

Dr. Ai Huong Phu, D.O., primarily treated Ms. Spear for her right arm problems with

contractures and cramping. (Tr. at 32). In an April 22, 2015 work capacity report to the SSA, Dr.

Phu stated Ms. Spear was limited to lifting/carrying less than ten pounds occasionally or frequently

as Ms. Spear had right upper extremity spasms with increased weight; standing/walking (with

normal breaks) at least two hours in an eight hour work day due to her left buttock/pelvic pain;

inability to sit six hours in an eight hour workday as she needed to alternate positions because her

left buttock/groin/pelvic pain increased with sitting, requiring her to stand and walk about every

ten minutes; never climbing, stooping, kneeling crouching, or crawling, which could aggravate her

right upper extremity and left buttock/groin/pelvic pain; and occasional reaching, handling,

fingering, feeling with her left upper extremity only, and seldom with the right upper extremity.

(Tr. at 819–20). Dr. Phu further opined that Ms. Spears could not work an eight-hour work day

five days a week, only intermittent, unscheduled work of "no more than 2 hours a day with a

change in positioning without too much distraction from pain;" would require unscheduled breaks

of 10 to 15 minutes to relieve pain and fatigue; could not tolerate any position for more than 10 to 15 minutes, and estimated she would have one to two bad days per week. (*Id.* at 820).

The ALJ acknowledged Dr. Phu's report, but did not "entirely adopt[]" those restrictions because at the time of the exam[3] Ms. Spear had no significant limitations, had normal gait and station, could walk on toes and heels with good balance, had normal manual motor testing, normal sensation, full flexion and extension, sidebending and rotation of her lumbar spine, negative straight leg raise on the left, and normal mental presentation. (Tr. at 809). Ms. Spear rated her pain level at 2/10 that day. (*Id.* at 806). Baclofen improved her pain, but she had run out and needed a medication refill. (*Id.*) She was going to the pool once a week to tread water and walk and had been referred to a chronic pain specialist. (*Id.*) As noted by Plaintiff, Dr. Phu also found tenderness over the left greater trochanter, left SI joint, left gluteus maximus, piriformis, ischial tuberosity and medially toward her groin, positive FABER on the left, in addition to findings that Ms. Spear had decreased sensation over her left temporal bone, cervical decreased flexion to 70, and limited forward flexion of bilateral shoulders. (*Id.* at 809). "It is the ALJ's duty to resolve conflicts in the evidence." *Travis v. Astrue*, 477 F. 3d 1037, 1041 (citing *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)). Where "there is conflicting evidence on the record, the ALJ's determination that the physicians' opinions were not supported by objective medical evidence does not lie outside the available zone of choice." *Id.* at 1042 (citing *Hacker*, 459 F.3d at 938). "[A] decision is not outside this zone simply because the evidence also points to an alternate outcome." *Smith v. Berryhill*, No. 3:16-cv-05013-DGK, 2017 WL 1609749, at *1 (W.D. Mo. May 1, 2017)(citing *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011)). There was conflicting evidence from Dr. Phu, which the ALJ

---

[3] The records indicate Dr. Phu actually saw Ms. Spear on April 9, 2015, (Tr. at 806–10) before writing the April 21, 2015, work capacity assessment.

resolved by accepting only part of her opinions, taking into account Ms. Spear's right arm and hand pain, for instance. The ALJ did not err in failing to accord significant weight to Dr. Phu's opinions.

2.      Ms. Hunerdosse

Nurse practitioner Michelle Hunerdosse treated Ms. Spear on August 14, 2012; April 25, 2013; August 30, 2013; November 7, 2013; January 24, 2014; August 14, 2014; January 20, 2015, and February 20, 2015 before writing a statement to the SSA regarding Ms. Spear's work capacities on April 24, 2015. (Tr. at 650-652). In that statement, Ms. Hunerdosse assessed Ms. Spear could lift/carry less than 10 pounds 1/3 of the time; was unable to walk/stand for 1/3 of a workday and would require frequent breaks and position changes, including sitting on a toilet seat for 30-60 minutes at a time; that Ms. Spear could not perform an 8-hour workday 5 days a week job. (*Id.* at 650). The ALJ found the assessment was based on Ms. Spear's subjective reports and not on Ms. Hunerdosse's objective findings. (*Id.* at 31). Specifically, the ALJ noted that at a February 20, 2015 visit Ms. Spear reported elbow pain, and Ms. Hunerdosse only examined the elbow. (*Id.*at 31; 645-646). At a January 2015 examination Ms. Hunerdosse reported on physical examination that Ms. Spear had normal gait and station. (*Id.* at 612). By comparison, the ALJ noted Dr. Dana Simon, M.D., examined Ms. Spear on February 27, 2015, and on physical examination found her to be normal, alert, in no acute distress with no pain over the left groin or lower abdomen, negative straight leg raise but some "apparent myofascial pain over the left ischium," her cognitive exam was "grossly normal with cranial nerves 2-12 grossly intact, motor strength normal and lower extremities," and "some tenderness over the ischial tuberosity on the left." (*Id.* at 816-817). The ALJ gave little weight to Ms. Hunerdosse's opinions given this conflicting evidence in the medical

records, her reliance on Plaintiff's subjective reports, and the fact she was not an "acceptable medical source." (*Id.* at 32).

> The list of acceptable medical sources includes licensed physicians, psychologists, and optometrists. 20 C.F.R. § 416.913(a). In addition to these acceptable medical sources, an ALJ may consider evidence from other sources, including nurse practitioners and social welfare agency personnel. *Id.* §§ 416.913(d)(1), (d)(3). An ALJ has discretion to consider opinions from these other sources "*so long as* [they are] not wholly inconsistent with other opinions." *Crawford v. Colvin*, 809 F.3d 404, 408 (8th Cir. 2015).

*Smith*, 2017 WL 1609749, at *2. The ALJ properly exercised his discretion in his consideration of Ms. Hunerdosse's opinions based on his examination of the entirety of the medical records.

### 3. Ms. Green

Physical therapist Joann Green treated Ms. Spear from March 29, 2012 through October 10, 2012 on a regular basis (with some breaks). (Tr. at 455-464). Ms. Spear was discharged from treatment on January 4, 2013 as she had not been treated since September 26, 2012 and canceled her last scheduled appointment for October 23, 2012 without rescheduling. (*Id.* at 357).

Ms. Green completed a questionnaire for Ms. Spear's life insurance company on May 9, 2012. (Tr. at 429-430). In the report, she recommended Ms. Spear remain out of work beyond April 27, 2012 because Ms. Spear had difficulty sitting secondary to pain. Ms. Green could not provide information about when Ms. Spear could return to work and would reassess her condition in six to eight weeks. (*Id.*) The ALJ gave little weight to Ms. Green's assessment of less than sedentary work[4] because the physical therapist did not qualify as an acceptable medical source and because Ms. Spear did return to full-time work for eight months after her accident and by the time of her hearing had obtained an Associates Degree. (*Id.* at 31).

---

[4] The Court notes the ALJ incorrectly referenced a report by Ms. Hunerdosse in discussing the physical therapist's opinion. (Tr. at 31). The Court finds this error to be harmless.

Again, the ALJ properly exercised his discretion in his consideration of Ms. Green's opinions based on his examination of the entirety of the records in comparison to Ms. Green's observations.

B.      Assessment of RFC

The ALJ determined that Ms. Spear had the RFC to perform light work, with some limitations consistent with her impairments, specifically:

> except sitting up to two hours in a workday; occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching, or crawling; never climb ropes and scaffolds; no overhead reaching; and with her right-dominant hand can only occasionally handle and finger. Mentally, she can perform three to four step tasks.

(Tr. at 26). "Light work" involves

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b). "Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." SSR 83-10, 1983 WL 31251 at *6.

Plaintiff argues the RFC assessment is inconsistent with the medical record "as well as the opinions of Dr. Phu, Ms. Hunerdosse, and Ms. Green." (Pl. Brief [7] at 29). She details multiple entries in the medical evidence between June 27, 2012 and April 24, 2015 describing reports of pain, Ms. Spear's physical abilities to stand and walk; and her need to change positions. (*Id.* at 30-31). Defendant responds that Plaintiff's citations to the treatment notes are an invitation to the

Court to impermissibly reweigh the evidence and the ALJ's determination of RFC was proper, particularly as it took into account Ms. Spear's right hand and arm pain. (Def.'s Br. [8] at 13–14).

As discussed above, the ALJ gave little weight to or discounted the opinions of Dr. Phu, Ms. Hunerdosse and Ms. Green, although he still took into account some limitations as demonstrated by the modifications to "light work" in the RFC. The Court finds it was within the ALJ's discretion to do so, given his review of the overall medical record. In addition to the medical evidence Plaintiff cited, treatment notes from 2014 through 2015 showed Ms. Spear's straight leg raises were negative, her gait and stance were normal, and she could walk on her heels and toes with good balance. (Tr. at 785, 790, 796, 802, 809, 816). Additionally, her sensation, cranial nerves, lumbar alignment/range of motion were consistently normal and she exhibited full motor strength in her upper and lower extremities at examinations. (*Id.*at 577, 581, 585, 785, 790, 796, 802, 809, 816). Ms. Spear also consistently denied difficulty walking. (*Id.*at 577, 581, 581, 589, 633, 784, 816). Thus, there is support in the record for the determination that Ms. Spear could stand and walk as required for light work. (*Id.* at 26). The RFC acknowledged Ms. Spear's right hand and arm pain and limited her to no overhead reaching and only occasional handling and fingering with her right hand. (*Id.* at 26, 32). Ms. Spear reported being able to dust, use a computer, play cards, play games on her phone, prepare simple meals, wash some dishes, and do small loads of laundry. (*Id.* at 256, 258, 612, 645). Substantial evidence supports the ALJ's RFC assessment in this case.

C.     Assessment of Subjective Complaints

Finally, Plaintiff argues the ALJ considered her credibility under SSR 96-7p, which was superseded by SSR 16-3p on March 16, 2016. The ALJ's decision was entered September 25, 2015. It would not be possible for the ALJ to follow SSR 16-3p as it was not in existence at the

time of his determinations. Thus, his credibility analysis was properly undertaken under SSR 96-7p and the *Polaski* factors.

> In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

*Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)(citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

The ALJ found Ms. Spear was not fully credible for several reasons articulated in the record. Ms. Spear testified about headaches, but medical records from her 2011 accident did not mention a concussion and CT and MRI of her head were negative. (Tr. at 30). Ms. Spear testified she never drove alone, but there were medical reports indicating she drove to exams herself. (*Id.* (citing Tr. at 329, 633)). The ALJ noted Ms. Spear had been discharged from physical therapy after not appearing for treatment between October 2012 and January 2013. (Tr. at 30). He found it significant that Ms. Spear returned to work full-time for eight months after her 2011 accident, took pictures at a game in July 2012, helped her daughter pack for college and move into her dorm in August 2012, and also worked a concession stand in September 2012; then in June 2013 sat at two ballgames and took pictures, and when she was working, drove a truck/ambulance. (*Id.*) The ALJ also considered Ms. Spear's report of daily activities. At the hearing, Ms. Spear testified she went to the YMCA once a week to walk and do pool exercises and was going to start going twice a week. (*Id.*) In January 2014, she reported going to the Y twice a week, walking on the treadmill and in the water (although she reported her pain was worsened by that activity). (*Id.* at 541). The ALJ noted that physical therapy and trigger point release in April 2014 gave Ms. Spear some relief (*id.* at 589), yet by December 2014 she had not been at physical therapy for eight weeks and was

busy with work and new appointments with Dr. Schumacher. (*Id.* at 567). The ALJ noted Ms. Spear was working on her computer in January 2015 (*id.* at 610), and reported in February 2015 she aggravated her right elbow playing games on her phone in December 2014. (*Id.* at 645). She reported to Ms. Hunerdosse at the February 2015 visit that she spent a lot of time on the computer for graphic design. (*Id.*) The ALJ found these reports "suggest a capacity to sustain work activity, in terms of concentration, persistence, and pace." (*Id.* at 30). He noted she visited Iowa City for a pudendal nerve block, which she decided not to get, and had no new symptoms after that when she saw Dr. Phu in April 2015. (*Id.* at 806). Ms. Spear told Dr. Phu she was trying to get out of the house three days a week. (*Id.*) Based on all of these events and reports, the ALJ found Ms. Spear's allegations "very excessive, not fully credible, and therefore treated accordingly." (*Id.* at 30).

The ALJ articulated specific reasons why he did not find Ms. Spear to be fully credible under the standards existing at the time of his decision. So long "'as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so,'" courts are to defer to the ALJ's credibility finding. *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010)(quoting *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007)(internal quotation omitted)); *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011).

## V.   REPORT AND RECOMMENDATION AND ORDER

After a thorough review of the entire record in accordance with the deferential standard of review, the Court concludes that the ALJ's determination that Ms. Spear was not disabled within the meaning of the Act is supported by substantial evidence in the record when viewed as a whole. The decision of the ALJ should be affirmed. The undersigned recommends entry of judgment in favor of the Defendant and against Plaintiff dismissing the Complaint.

IT IS ORDERED that the parties have until **February 8, 2018** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the parties object and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a parties' right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

**IT IS SO ORDERED.**

Dated January 25, 2018.

Helen C. Adams
Chief U.S. Magistrate Judge